IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **YORK INTERNATIONAL CORPORATION,** | : | |
| | : | |
| **Plaintiff** | : | **Civil No. 1:10-CV-0692** |
| | : | |
| **v.** | : | |
| | : | |
| **LIBERTY MUTUAL INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant** | : | **Judge Sylvia H. Rambo** |
| | : | |

## M E M O R A N D U M

In this insurance action for defense and indemnification of underlying asbestos-related claims, Plaintiff seeks declarations regarding the rights and obligations of the parties under general liability insurance policies that it purchased from Defendant, as well as damages to remedy Defendant's alleged breach of contract.  Presently before the court are cross-motions for partial summary judgment with regard to choice of law (Docs. 82 & 83), wherein the parties dispute whether Pennsylvania or New York law should control the outcome of this case.  Also before the court is Plaintiff's motion to strike (Doc. 89), which attacks portions of an affidavit filed by Defendant in support of its motion for partial summary judgment (Doc. 83-1).  For the reasons stated herein, the court will grant Plaintiff's motion for partial summary judgment, grant in part and deny in part its motion to strike, and deny Defendant's motion for partial summary judgment.

**I.**         **Background**

The facts of this case are largely undisputed.  In considering each of the instant cross-motions for summary judgment, the court relied on the uncontested facts or, where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party in accordance with the relevant standard when deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

Plaintiff York International Corporation ("Plaintiff") filed this case on March 30, 2010, against Liberty Mutual Insurance Company ("Defendant"), seeking indemnification and defense from Defendant for more than one thousand underlying asbestos claims.  (Doc. 1.)[1]  The insurance policies that Plaintiff contends cover the underlying asbestos actions (the "York Policies") consist of four separate but functionally identical policies with one-year terms and cover the period from October 1, 1952 through October 1, 1956.  Pursuant to these policies, Defendant provided general products liability insurance to York Corporation, an entity that had all of its assets and liabilities acquired by Plaintiff through a series of corporate transactions.[2]  (Doc. 22, ¶¶ 2, 34, 40.)  The underlying asbestos claims, which have been filed in several jurisdictions throughout the United States, sound in products liability, alleging bodily injury, sickness, and disease resulting from exposure to

---

[1]  The original complaint also sought relief for breach of the covenant of good faith and fair dealing and statutory bad faith.  (Doc. 1, Counts III &IV.)  However, Plaintiff agreed to withdraw those claims on March 2, 2011.  (Doc. 21, ¶ 3.)

[2]  A more detailed summary of Plaintiff's corporate history, which is not relevant to the instant set of motions, is laid out in the court's previous summary judgment memorandum of May 26, 2011.  *See York Int'l Corp. v. Liberty Mut. Ins. Co.*, Civ. No. 1:10-cv-0692, 2011 WL 2111989 (M.D. Pa. May 26, 2011).

asbestos-containing products sold by York Corporation and shipped throughout the United States.  (Doc. 1, ¶ 14.)

During the time period covered by the York Policies, as well as the negotiation and consummation of the policies, York Corporation resided in York, Pennsylvania and was incorporated in Delaware.  (*Id.*, ¶¶ 1, 30.)  At all relevant times, Defendant was, and is, a Massachusetts mutual insurance company with a principal place of business in Boston, Massachusetts.  (Doc. 5, ¶ 5.)

The parties previously submitted cross-motions for summary judgment as to whether a non-assignment clause in the relevant insurance policies barred Plaintiff from receiving assignment of claims from its predecessor corporate entity, and in its decision of May 26, 2011, the court held that Plaintiff was not barred from submitting claims for asbestos-related injury to Defendant under the York Policies, but limited the scope of those claims to those occurring between October 1, 1952 and October 1, 1956.  (Doc. 52.)

After Plaintiff submitted to Defendant those asbestos claims to which it believed Defendant owed a duty to defend and indemnify, a dispute arose as to choice of law.  On December 8, 2014, the parties filed the instant cross-motions for summary judgment, statements of facts and supporting briefs.  (Docs. 82-86.)  In their respective motions, the parties seek a determination as to whether the court will apply the laws of Pennsylvania or New York to the action.  Due to the passage of time between the period covered by the York Policies and the initiation of the instant action – more than fifty years – no party with firsthand knowledge of the negotiation or consummation of the policies could be identified, and complete copies of the York Policies could not be located.  (Doc. 22, ¶¶ 34-43.; Doc. 83-1, ¶ 6.)  However, the

3

parties were able to locate policy jackets, declarations pages, and certificates of insurance for several of the policies. (*Id*., Exs. 26-30.)  Relevant to the instant dispute, the declarations pages list York Corporation's address as "c/o Henry E. Wood & Associates Inc., 45 John Street, New York 38, New York." (*Id*., Exs. 28 & 29.)  The certificates of insurance, however, list York Corporation's address as York, Pennsylvania. (*Id*., Ex. 30.)

In support of its motion for summary judgment, Defendant provided an affidavit of its former longtime employee and current consultant, Jerry McCullough (the "McCullough Affidavit"). (Doc. 83-1.)  Mr. McCullough began his employment with Defendant in 1961, approximately five years after the period covered by the York Policies. (*Id*. at ¶ 2.)  In the affidavit, Mr. McCullough testified as to Defendant's standard practices during the 1950s, and, more specifically, as to the role that Henry E. Wood & Associates Inc. ("Henry E. Wood") played in acquiring the York Policies. (*See id*. at ¶¶ 7-19.)  Plaintiff has filed a motion to strike portions of the affidavit, which challenges, *inter alia*, Mr. McCullough's personal knowledge of the facts contained therein, primarily on the basis that his employment with Defendant began after the negotiation and consummation of the York Policies. (Doc. 89.)  On January 12, 2015, Defendant filed an opposition to the motion to strike (Doc. 97), together with a supplemental affidavit, in order to provide additional foundation for Mr. McCullough's personal knowledge of the averments contained in his affidavit (Doc. 97-1).

The cross-motions for summary judgment and the motion to strike have been fully briefed and are ripe for disposition.

## II.          Motion to Strike

The court will first consider Plaintiff's motion to strike, which challenges the admissibility of certain portions of the McCullough Affidavit relied upon in Defendant's brief in opposition to Plaintiff's motion for summary judgment. Plaintiff contends that the court should not consider these portions of the record when deciding the cross-motions for summary judgment because the evidence would be inadmissible at trial.

### A.     Legal Standard

Either party may challenge the admissibility of evidence used to support a motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rule 56(c)(2) provides, in pertinent part, that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, when the admissibility of evidence is challenged, the party relying on the evidence must demonstrate that such evidence is capable of admission at trial before it can be considered by the court on summary judgment. However, this requirement does

> not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. [Rule 56] permits a proper summary judgment motion to be opposed by any materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing . . . [that specific facts show there is a genuine issue for trial].

*Celotex Corp.*, 477 U.S. at 324; *see also Lin v. Rohm & Haas Co.*, 293 F. Supp. 2d 505, 511 (E.D. Pa. 2003). Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at

trial.  *See* Fed. R. Civ. P. 56(c)(2).  Accordingly, the party offering the evidence must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment.  *See Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 643 (E.D. Pa. 2004).  Evidence that will be inadmissible at trial cannot be considered when ruling on a motion for summary judgment.  *See Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 387-88 (3d Cir. 1999); *Sharp v. Pa. Army Nat'l Guard*, Civ. No. 1:11-cv-1262, 2013 WL 1703583, *3 (M.D. Pa. Apr. 19, 2013).

## B.   Discussion

Plaintiff's motion to strike asserts three separate objections to the admissibility of the McCullough Affidavit.  The first contention is that some of the assertions in the McCullough Affidavit are by an affiant that lacks personal knowledge.  The second contention is that certain statements in the McCullough Affidavit are contradicted by the affiant's previous deposition testimony.  The third contention is that several assertions in the McCullough Affidavit constitute legal conclusions.  These arguments will be addressed in turn.

### 1.   Lack of Personal Knowledge Challenges to Contents of McCullough Affidavit

Federal Rule of Civil Procedure 56 requires that any evidence to be considered in the summary judgment record must at least be capable of being admissible evidence, and operates in conjunction with Federal Rule of Evidence 602, which governs the scope of a witness's testimony.  Rule 602 permits a witness to "testify to a matter only if sufficient evidence is introduced to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.  Rule

602 creates a low threshold of admissibility, as witness testimony should be admitted if the judge could reasonably find that the witness perceived the event. *Sullivan v. Warminster Twp.*, 461 F. App'x 157, 162 (3d Cir. 2012).  However, this should not extend so far as to allow witness testimony that is merely based on speculation as to what a third party believed or knew. *See Palfrey v. Jefferson-Morgan Sch. Dist.*, Civ. No. 06-cv-1372, 2008 WL 4412230, *12 (W.D. Pa. Sept. 25, 2008).

Plaintiff attacks Paragraphs 7, 9, 10, 12, 13, 14, 15, 17, 18, and 19 of the McCullough Affidavit for lack of personal knowledge.  These paragraphs read as follows:

> 7.  . . . I am very familiar with the sales and underwriting protocols of Liberty Mutual Insurance in the 1950s and the sales and underwriting protocols for customers such as York Corporation.

> 9.  Although documents regarding the issuance of the policies apparently have not been located, I have reviewed other documents which indicate that Henry E. Wood provided the types of services that I would expect would be provided by an insurance broker or advisor, such as advising on the types of claims that should be reported to Liberty Mutual Insurance's coverage positions, and dealing with other insurance-related problems.

> 10.  Back in the 1950s, Liberty Mutual Insurance was a direct writer which did not typically deal with brokers, but I am familiar with the standard practices of insurance brokers and advisors during this time period.

> 12.  When the insured employed a broker/advisor, the standard practice was to send the policy to the broker/advisor so that the broker/advisor could review the policy to make sure that it provided the coverage that had been negotiated.

> 13.  Once the broker/advisor was satisfied that the policy provided the coverage that had been negotiated, the broker/advisor would send the policy to the insured.

7

14. Based on this standard practice, when Liberty Mutual Insurance issued the policies at issue, they would have been sent to Henry E. Wood in New York.

15. The Declarations pages to the Liberty Mutual Policies identify the Sales Office for the policies as New York. This indicates that the policy was sold out of the New York Division of Liberty Mutual Insurance and that a salesperson in New York would have been responsible to negotiate the policy with the designee of York Corporation.

17. Based on the above, the policies issued to York Corporation would have been negotiated in New York between a salesperson in Liberty Mutual Insurance's New York office and Henry E. Wood.

18. The standard practice of insurance brokers with respect to premium payment was that the broker/advisor would send a bill to the insured for a gross premium amount. The insured would send payment for that amount to the broker/advisor and the broker/advisor would then deduct its commission or fee and send the remainder to the insurance sales person.

19. Based on this standard practice, Henry E. Wood would have sent the premium payment to Liberty Mutual Insurance in New York.

(*See* Doc. 90, at pp. 3-5, 12 of 13.)

Plaintiff argues that the court should strike the preceding paragraphs because Mr. McCullough began his employment with Defendant in 1961, nearly ten years after the negotiation of the first York Policy and nearly five years after the expiration of the policies' coverage, and therefore Mr. McCullough's testimony is based only speculation. In response, Defendant acknowledges that Mr. MucCullough's employment began after the negotiation and execution of the York Policies, but nevertheless contends that Mr. McCullough has personal knowledge of

8

the facts contained in his affidavit.  (Doc. 97, p. 2 of 17.)  Defendant asserts that Mr. McCullough's personal knowledge is based upon his review of other insurance policies issued by Defendant during the same time period as those issued to Plaintiff, and his familiarity, through his review of documents and job training, with Defendant's standard protocols and procedures during the 1950s.  (Doc. 97, pp. 4-5 of 17.).

While it is true that Mr. McCullough's review of documents as to Defendant's policies and protocols for underwriting insurance in the 1950s may give him personal knowledge of Defendant's standard practices during that time period, *see Khodara Envtl. II, Inc. v. Chest Twp.*, Civ. No. 3:2002-cv-96, 2007 WL 3146745, *1 (W.D. Pa. Oct. 26, 2007) ("[P]ersonal knowledge of a matter included in an affidavit under Rule 56(e)[3] may be based not only upon knowledge gained through one's sensory perceptions, but through a review of records of the matter in question.") (citing *Wash. Cent. R.R. Co. v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993)), it does not impart on Mr. McCullough personal knowledge of the negotiation or consummation of the York Policies.  The fact that a practice or protocol was standard does not ensure that it happened in every situation, including in the instant case.  Indeed, Mr. McCullough's own testimony illustrates that working through a broker was in fact *not* Defendant's standard practice, as he states that "[i]t was not the typical practice that insureds would have a broker or advisor assist with the negotiation of policies issued by Liberty Mutual Insurance, but it did

---

[3]  After the opinion in *Khodara*, Rule 56 was amended so that the language from subpart (e)(1) of Rule 56 was moved to subart (c)(4).  "Case law referring to Rule 56(e)(1) remains relevant to newly amended Rule 56(c)(4)."  *Bell v. Lackawanna Cnty.*, 892 F. Supp. 2d 647, 661 n.12 (M.D. Pa. 2012) (citation omitted).

happen on a number of occasions during my career."  (Doc. 97-1, ¶ 10e.)  Because

Mr. McCullough does not have personal knowledge of the negotiation or

consummation of the York Policies as he was not employed by Defendant until

several years later, any averments by Mr. McCullough regarding what may have

happened based on Defendant's practices is purely speculative.  That Mr.

McCullough testified that brokers assisted in the negotiation of policies with insureds

only "on a number of occasions" over his more than thirty-year employment with

Defendant adds to the speculative and unreliable nature of the testimony.  Such

speculation fails to meet even the low threshold for admissibility established by Rule

602, and therefore does not conform to Rule 56, but merely represents Mr.

McCullough's conclusions, opinions, or beliefs.  *See Maldonado v. Ramirez*, 757

F.2d 48, 51 (3d Cir. 1985) ("[T]he affiant must ordinarily set forth facts, rather than

opinions or conclusions."); *see also Carey v. Beans*, 500 F.Supp. 580, 583 (E.D. Pa.

1980) ("Affidavits speculating as to motivations but containing no factual support do

not conform to [Rule 56.]"); *Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 993 (E.D.

Wis. 1999) ("[P]redictions of certain . . . actions that could or would have occurred

are indeed conclusory speculation, on which [the court] will not rely in making [its]

decision regarding summary judgment.").  The court will therefore strike the

following portions of the McCullough Affidavit:

> 14.  Based on this standard practice, when Liberty
>       Mutual Insurance issued the policies at issue, they
>       would have been sent to Henry E. Wood in New
>       York.
>       . . .
>
> 17.  Based on the above, the policies issued to York
>       Corporation would have been negotiated in New
>       York between a salesperson in Liberty Mutual
>       Insurance's New York office and Henry E. Wood.

. . .

19.   Based on this standard practice, Henry E. Wood
      would have sent the premium payment to Liberty
      Mutual Insurance in New York.

(Doc. 83-1, ¶¶ 14, 17 19.)

## 2.   Contradictory Testimony Challenges to Contents of the McCullough Affidavit

Plaintiff also contends that Paragraphs 12 to 15 and 17 to 19 should be stricken under the sham affidavit doctrine because they contradict Mr. McCullough's prior deposition testimony.  (Doc. 90, pp. 9-10 of 13).  The purpose of the sham affidavit doctrine is to remove from the record any "affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).  The doctrine allows a district court to disregard an "affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004).  However, "not all contradictory affidavits are necessarily shams[,]" *Jiminez*, 503 F.3d at 254 (citing *Baer*, 392 F.3d at 625), and "an affiant has the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit."  *Id.* (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)).  Here, Plaintiff argues that the portions of the McCullough Affidavit wherein Mr. McCullough refers to Henry E. Wood as a broker, or as an advisor providing services that would be expected of a broker, should be stricken because they are in contradiction to Mr. McCullough's prior deposition testimony, wherein he testified that "Liberty mutual, as a direct dealing company, did not work through brokers."  (Doc. 82-7, at p. 54:2-3.) .

To determine whether Mr. McCullough did, in fact, contradict himself, it is helpful to look at the full exchange, of which Plaintiff has cited an excerpt, during Mr. McCullough's deposition:

> Q:   Do you have any understanding as to who Henry E. Wood and Associates was?
>
> A:   Henry Wood Associates would have been either a consultant or an insurance adviser.
>
> Q:   Could it have been a broker?
>
> A:   Liberty Mutual, as a direct dealing company, did not work through brokers.  Some brokers did true consulting and advising work in addition to brokering.

(Doc. 82-7, at pp 53-54.)  This testimony does not appear to contradict the McCullough Affidavit.  Mr. McCullough's supplemental affidavit further alleviates any potential contradictions as it explains, in relevant part, as follows:

> c.   The insured or prospective insured was free to bring to the table whomever it wanted to negotiate the coverage with Liberty Mutual Insurance, including brokers/advisors.
>
> d.   Liberty Mutual Insurance made it clear that all fees/commissions for those services would be paid by the insured not by Liberty Mutual Insurance. Liberty Mutual Insurance was a direct dealing company, with its own trained insurance agents and was not dependent on working through brokers to place coverage.
>
> e.   It was not the typical practice that insureds would have a broker or advisor assist with the negotiation of policies issued by Liberty Mutual Insurance, but it did happen on a number of occasions during my career.

(Doc. 97-1, ¶¶ 10c-e.)  The court thus finds that Mr. McCullough has provided satisfactory clarification for any perceived contradiction between his deposition

12

testimony and the McCullough Affidavit.  Mr. McCullough consistently testified that Defendant's standard practice was to work directly with insureds and underwrite the insurance itself, without going through a broker.  Mr. McCullough's statement that Defendant did not "work through brokers" is therefore compatible with his testimony that Defendant did not hire brokers to do its underwriting, and instead was a "direct dealing company."  According to Mr. McCullough, an insured could choose to employ a broker or advisor in some capacity, but Defendant would not pay any commissions or fees to a third-party intermediary.  In that event, it was the insured who worked directly through the broker or advisor, not Defendant.[4]

Because the court finds no contradiction between Mr. McCullough's deposition testimony and the McCullough Affidavit, the court will not strike any portion of the McCullough Affidavit under the sham affidavit doctrine.

### 3.    Legal Conclusion Challenges to Contents of the McCullough Affidavit

Lastly, Plaintiff contends that Paragraphs 16, 20, and 23 should be stricken because they constitute impermissible legal conclusions.  (Doc. 90, pp. 11-12 of 13).  Opinion testimony is limited to testimony that is helpful to the factfinder to either clearly understand the witness's testimony or to determine a fact in issue. Fed. R. Evid. 701.  Because, as the factfinder, a jury does not decide questions of law, legally conclusive statements, in which the law is applied to the facts, are not

---

[4]  Mr. McCullough's deposition testimony and additional testimony in both the McCullough Affidavit and Supplemental Affidavit further underscore the court's reasoning in striking portions of the McCullough Affidavit for lack of personal knowledge in Section II.B.1 of this memorandum, *supra*. Because Henry E. Wood was an agent for Plaintiff, and brokers or advisors could provide a plethora of different services, including, according to Mr. McCullough, "true consulting and advising work in addition to brokering," there is simply no basis for Mr. McCullough to speculate as to Henry E. Wood's actual involvement in the placement of the York Policies.

helpful to the jury and are thus inadmissible at trial or at summary judgment. *VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 428 n.4 (W.D. Pa. 1998) (quoting *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997)); *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 533 (D. Del. 2009).

Plaintiff argues that the following portions of the McCullough Affidavit contain improper legal conclusions:

16.   The Declarations pages to the Liberty Mutual Policies identify New York as the "Home State" for York Corporation. The "Home State" designation identifies the state in which the contract was consummated.

20.   The Liberty Mutual Policies did not afford coverage for York Corporation's operations in Pennsylvania, although the policies did afford coverage for York Corporation's nationwide products liability.

23.   The documents provided to me indicate that York Corporation decided not to insure its Pennsylvania operations through Liberty Mutual Insurance because it had obtained that insurance from another insurance company.

(Doc. 90, at p. 12 of 13.)

First, because "the interpretation of an insurance contract is a matter of law for the court," *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005) (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)), Paragraph 16 will be stricken to the extent that it seeks to conclude that New York was the place of contracting. As for Paragraphs 20 and 23, both parties have stipulated to the fact that the York Policies cover Plaintiff's products liability risk for the period from October 1, 1952 through October 1, 1956. Because Plaintiff's products liability exposure, and nothing more, is the subject matter of the

14

instant dispute, whether Plaintiff's general operations in Pennsylvania were insured by Defendant is of no relevance to the instant matter.  Therefore, the court need not consider these arguments.  Likewise, there is no need to strike any part of Paragraphs 20 or 23 of the McCullough Affidavit at this time because they are irrelevant to the choice of law issue being decided on summary judgment.          In conclusion, the court will strike Paragraphs 14, 17, and 19 as provided above, *supra* Section II.B.1, and will strike Paragraph 16 to the extent it concludes New York was the place of contracting.  The balance of Plaintiff's motion to strike will be denied.

**III.**      **Cross-Motions for Summary Judgment**

Plaintiff and Defendant have each separately moved for summary judgment on the choice of law issue.  Plaintiff contends that Pennsylvania law should be applied to the York Policies, while Defendant contends that the court should apply New York law.

**A.      Legal Standard**

"When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006) (citations omitted).  Summary judgment is proper when the record, taken in its entirety, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  "A fact

is material if it might affect the outcome of the suit under the governing law." *Douglas v. Discover Prop. & Cas. Ins. Co.*, 810 F. Supp. 2d 724, 727 (M.D. Pa. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "genuine" only where a sufficient evidentiary basis exists that would allow a reasonable factfinder to return a verdict for the nonmoving party.  *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 545 (3d Cir. 2012) (citing *Liberty Lobby*, 477 U.S. at 257).  When evaluating a motion for summary judgment, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Nationwide Mut. Ins. Co. v. Roth*, 252 F. App'x 505, 506 (3d Cir. 2007) (quoting *Saldana*, 260 F.3d at 232).

The initial burden of demonstrating the absence of a disputed issue of material fact falls on the moving party.  *See Celotex*, 477 U.S. at 323-24.  "Once the moving party points to evidence demonstrating no issue of material fact exists, the nonmoving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 231-32 (citations omitted).  If the nonmoving party's evidence "is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Liberty Lobby*, 477 U.S. at 249-50).  However, "[s]uch

affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)). A "[c]ourt need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement." *Verdetto v. State Farm Fire & Cas. Co.*, 837 F. Supp. 2d 480, 483 (M.D. Pa. 2011) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## B. Choice of Law

As a federal court sitting in diversity, the court must apply the choice of law rules of the state in which it sits. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws." *Hammersmith*, 480 F.3d at 230. "A 'deeper [choice of law] analysis' is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws." *Id*. (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)) (alterations in original). "When both states' interests would be harmed by the application of the other state's law, there is a 'true conflict,' and we must engage in the contacts and interests analysis to determine which state's law should apply." *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 230 (3d Cir. 2010) (quoting *Hammersmith*, 480 F.3d at 230–31).

"Pennsylvania applies a 'flexible rule which permits analysis of the policies and interests underlying the particular issue before the court' and directs courts to apply the law of the state with the 'most interest in the problem.'" *Id*. at 229 (citing *Hammersmith*, 480 F.3d at 227 (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805–06 (Pa. 1964))). "In applying this rule, if confronted with a true conflict, we first consider each state's contacts with the contract as set forth in the Restatement (Second) of Conflict of Laws." *Id*. at 230 (citations omitted). "This analysis requires more than a 'mere counting of contacts.'" *Hammersmith*, 480 F.3d at 231 (quoting *Cipolla*, 267 A.2d at 856). "Rather, we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987).

## C.   Discussion

The parties agree that a true conflict exists between the laws of Pennsylvania and New York regarding an insurer's duty to indemnify an insured, and therefore an in-depth choice of law analysis is warranted. The parties do not agree, however, on whether a true conflict exists between Pennsylvania and New York with regard to an insurer's duty to defend. Therefore, the court must first determine whether a true conflict exists with regard to the duty to defend before engaging in a choice of law analysis on that issue.

### 1.   Duty to Defend

Plaintiff argues that there is no conflict between Pennsylvania and New York law when it comes to an insurer's duty to defend an insured, and the court agrees. Under Pennsylvania law, "courts have taken a relatively broad view in discerning whether a complaint triggers the insurer's duty to defend." *Berg Chilling Sys. Inc. v. Hull Corp.*, 70 Fed.Appx. 620, 624 (3d Cir. 2003). "An insurance company's duty to defend a suit against an insured is determined solely on the basis of the allegations of the complaint in the underlying action." *Westfield Ins. Co. v. Bellevue Holding Co.*, 856 F. Supp. 2d 683, 691 (E.D. Pa. 2012) (quoting *Nat'l Fire Ins. Co. of Hartford v. Robinson Fans Holdings, Inc.*, Civ. No. 10-cv-1054, 2011 WL 1327435, *1 (W.D. Pa. Apr. 7, 2011)); *see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006). The question of whether an insurer has a duty to defend its insured in an action brought by a third party, therefore, "depends upon a determination of whether the third party's complaint triggers coverage." *Kvaerner*, 908 A.2d at 896 (quoting *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)). The duty to defend "is broader than the duty to indemnify, in that the former duty arises whenever an underlying complaint may 'potentially' come within the insurance coverage." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999). Therefore, an insurer can avoid its duty to defend a claim only "when it is apparent on the face of the complaint that none of the injuries fall within the purview of the insurance policy." *Westfield*, 856 F. Supp. 2d at 692 (citing *Peerless Ins. Co. v. Brooks Sys. Corp.*, 617 F. Supp. 2d 348, 356 (E.D. Pa. 2008). Once the duty to defend is triggered, even "when an insured tenders multiple claims to an insurer for defense, the insurer is obligated to undertake defense of the entire suit as long as at

least one claim is potentially covered by the policy." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517-18 (3d Cir. 2012) (quoting *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 831 n.1 (3d Cir. 1995)).

The duty to defend under New York law is materially the same as under that of Pennsylvania. "Under New York law, an insurer's duty to defend is extremely broad and distinct from the duty to indemnify." *Napoli, Kaiser & Bern, LLP v. Westport Ins. Corp.*, 295 F. Supp. 2d 335, 338 (S.D.N.Y. 2003) (citations omitted). As with Pennsylvania law, a court applying New York law must start with the allegations contained in the complaint, and "[a]n insurer must defend whenever the four corners of the complaint suggest . . . a reasonable possibility of coverage." *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 160 (2d Cir. 2003) (citing *Cont'l Cas. Co. v. Rapid–Am. Corp.*, 609 N.E.2d 506, 509 (N.Y. 1993)). Although an insurer is not obligated to defend an insured "if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured," *Frontier Ins. Co. v. New York*, 662 N.E.2d 251, 253 (N.Y. 1995), the duty to defend "perdures until it is determined with certainty that the policy does not provide coverage." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001). Additionally, "[i]f any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." *Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*, Civ. No. 5:06-cv-1117, 2010 WL 1257943, *6 (N.D.N.Y. Mar. 25, 2010) (quoting *Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 690 N.E.2d 866, 869 (N.Y. 1997)); *see also Hotel Des Artistes, Inc. v. Transamerica Ins. Co.*, Civ. No. 93-cv-4563, 1994 WL 263429, *3 (S.D.N.Y. June 13, 1994) ("[E]ven if only a single claim in the

underlying complaint potentially falls within the indemnity coverage of the policy, the insurer must defend the entire action.").

Because an insurer's duty to defend is nearly identical according to the laws of both Pennsylvania and New York, no true conflict exists, and the court need not conduct an in depth choice of law analysis. The court, therefore, may refer interchangeably to the laws of either jurisdiction.

## 2.    Duty to Indemnify

Unlike with the duty to defend, the parties agree that there is a true conflict between Pennsylvania and New York law regarding an insurer's duty to indemnify an insured. Under Pennsylvania law, an insurer is obligated, at the insured's option, to indemnify for the full amount of loss, up to the policy limits, even if other insurers are available and portions of the loss are attributable to time periods in which the indemnifying insurer did not have a policy with the insured. As the Pennsylvania Supreme Court has held, "once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk. The insurer in question must bear potential liability for the entire claim." *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 508 (Pa. 1993). The insurer who pays out under this joint and several allocation approach can then seek contribution from other insurers who had policies covering other time periods where loss was sustained. *See id*. at 509.

New York law, however, does not impose joint and several allocation and an "all sums" obligation on an insurer. Rather, New York law allocates indemnification among insurers on a pro rata basis. Where "one continuous occurrence spanning two [or more] policy periods has resulted in injuries in fact

triggering [several] of those policies, an appropriate method for allocating the net losses among the [several] policies must be devised." *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1391 (E.D.N.Y. 1988) (prorating insurance coverage based on the proportion of loss sustained during relevant policy periods). Even where an insurance policy contains the language "all sums," courts applying New York law "have expressly rejected the conclusion that such language requires joint and several allocation of damages and instead have endorsed the pro rata allocation method for policies with that language." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 102 (2d Cir. 2012). A common method of allocation, and that which Defendant seeks in the present case, is referred to as the "time on the risk" method, whereby each insurer is responsible for the pro rata percentage of time the insurer's policy was in effect over the course of the full time period over which loss was sustained by the insured. *See Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695 (N.Y. 2002) (affirming trial court allocation of loss through "time-on-the-risk" method, while "not foreclos[ing] pro rata allocation among insurers by other methods.").

Because the allocation of an insurer's risk and duty to indemnify its insured is different under the laws of Pennsylvania and New York, a true conflict exists, and an in depth choice of law analysis is required. The court will thus apply the contacts with the contract analysis as set forth in the Restatement (Second) of Conflict of Laws.

### 3.     Choice of Law Analysis

When examining each state's contacts with the insurance contract under the Restatement, the court must "bear[] in mind that '[it is] concerned with the contract of insurance' and not the underlying tort." *Hammersmith*, 480 F.3d at 232-33 (quoting *McCabe v. Prudential Prop. & Cas. Ins. Co.*, 514 A.2d 582, 586 (Pa. 1986)). Section 193 of the Restatement directs that a court should apply the "law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." Restatement (Second) of Conflict of Laws § 193. There is no principal location of risk in the present case because Plaintiff sold and shipped products into several states. *See Hammersmith*, 480 F.3d at 233 (stating that where coverage was provided in multiple states, there was no "'principal location of the insured risk,' and the significance of this factor is 'greatly diminsh[ed].'") (quoting *Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.*, 880 F.2d 685, 690 (3d Cir. 1989)) (alterations in original).

Where there is no principal location of insured risk, a court should determine which state has greater contacts with the contract at issue by applying the factors contained in Section 188(2) of the Restatement, which include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*, § 188(2). These factors "are to be evaluated according to their relative importance with respect to the particular issue." *Id.* The court will address these factors in turn.

### a.   Place of Contracting

"An insurance contract is made in the state where it is delivered."
*Hammersmith*, 480 F.3d at 233 (citing *Harry L. Sheinman & Sons v. Scranton Life
Ins. Co.*, 125 F.2d 442, 444 (3d Cir. 1942)).  In the present case, the parties dispute
where delivery of the York Policies occurred.  Plaintiff contends that Pennsylvania
was the place of delivery because where there is no reliable evidence of the place of
delivery, delivery is presumed to have occurred where the insured is located.  (Doc.
88, at pp. 13-14 of 20.); *see Travelers Prop. Cas. Co. of Am. v. Chubb Custom Ins.
Co.*, 864 F. Supp. 2d 301, 310 (E.D. Pa. 2012) ("In the absence of proof of the place
of delivery, there is a presumption of delivery at the insured's residence.") (citing
*Crawford v. Manhattan Life Ins. Co. of N.Y.*, 221 A.2d 877, 881 (Pa. Super. Ct.
1966)); *see also Hammersmith*, 480 F.3d at 234 (finding the place of delivery as
New York based, in part, on the insured's headquarters being located in New York);
*Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 563 n.1 (3d Cir. 1976)
(presuming Pennsylvania was the state of delivery where the insured was located,
incorporated, and did business in Pennsylvania).  The parties do not dispute that at
the time of contracting, York Corporation was both headquartered and did business
in Pennsylvania.[5]  However, Defendant contends that New York is the state of

---

[5] The court finds that the location of York Corporation's headquarters during the time of
contracting for the York Policies is not a genuinely disputed fact, despite Defendant's efforts to muddy
the issue.  Defendant attempts to argue in its briefing that Pennsylvania has no connection to the York
Policies because Plaintiff was subsequently acquired by another corporation with its principal place of
business in Wisconsin.  (Doc. 86, pp. 13, 20 of 22.)  Plaintiff's current location, however, is not relevant
to the instant dispute.  When performing a choice of law analysis, the court must "focus on the facts and
the protection of the parties' justified expectations at the time of contracting."  *Pac. Emp'rs Ins. Co. v.
Global Reinsurance Corp. of Am.*, 693 F.3d 417, 438 (3d Cir. 2012).  York Corporation was founded in
York, Pennsylvania, in 1874 as York Manufacturing Company, which was later renamed as York
Corporation, and conducted its operations there.  (Doc. 82-4, ¶¶ 1-3; Doc. 92, ¶¶ 1-3.)  At the time of
contracting, York Corporation was still operating out of York, Pennsylvania, as evidenced by both the
certificates of insurance for the York Policies listing York, Pennsylvania as the address for York

(continued...)

delivery because Plaintiff's purported broker, Henry E. Wood, was located in New York, relying almost entirely on the "care of" Henry E. Wood address listed on the declarations pages of the policies.

Even if the court were to find that Henry E. Wood was Plaintiff's broker, Defendant would still fail to overcome the presumption that the York Policies were delivered to Plaintiff's residence. *See Chubb*, 864 F. Supp. 2d at 310. Significantly, there are no parties with firsthand knowledge of where the York Policies were delivered. Rather, the only reliable evidence of record indicating that the York Policies were delivered in New York is the "care of" Henry E. Wood address provided on the declarations pages of the policies. Even assuming, as Defendant contends, that the policies were initially delivered to Henry E. Wood at the listed address, it would have presumably forwarded those policies to the insured in Pennsylvania for execution. Under Pennsylvania law, "[i]t is unclear whether . . . a contract sent from an insurer to an insured's broker, which forwards the contract to the insured, is considered delivered at the place of the broker or the insured." *Id*. at 310 n.1. Furthermore, as discussed *supra*, there is no evidence on which the court can rely to find that Henry E. Wood was indeed acting as Plaintiff's broker in acquiring the York Policies. In the absence of proof to the contrary, delivery is presumed at the insured's residence. *Id*. at 310; *see also Hammersmith*, 480 F.3d at 233-34 (placing no importance on location of broker, who received the insurance

[5](...continued)
Corporation, as well as correspondence relating to other claims under the York Policies at that time coming from York, Pennsylvania. (Doc. 84-4, Exs. D-H.) Furthermore, Defendant admits in its answer to Plaintiff's statement of facts that York Corporation was located in Pennsylvania (Doc. 92, ¶ 5), and states in its own brief in support of summary judgment that "York Corporation maintained its principal place of business in Pennsylvania." (Doc. 86, at p. 20 of 22).

contract and forwarded it to the insured, and finding that delivery occurred at the insured's headquarters).  At the time of contracting, Plaintiff was headquartered in Pennsylvania, and thus this factor weighs in favor of applying Pennsylvania law.

### b.    Place of Negotiation

As to the second factor under the Restatement, the place of negotiation of the insurance contracts, the parties once again dispute whether this took place in Pennsylvania or New York.  Plaintiff argues that negotiation necessarily took place in Pennsylvania where it was headquartered, as Plaintiff had no offices in New York.  Plaintiff also cites the fact that Defendant had an office in York, Pennsylvania at the time of contracting as further evidence that negotiation of the York Policies likely took place in Pennsylvania.  Defendant, on the other hand, contends that negotiation took place in New York because the address listed on the York Policies for York Corporation is "care of" Henry E. Wood in New York, and Defendant's New York sales office is listed on the declarations pages.

The mere fact that Defendant had an office in York, Pennsylvania, without any other evidence, does not support Plaintiff's contention that Defendant negotiated the York Policies out of that office.  Rather, the listing of Defendant's New York sales office on the York Policies' declarations pages shows that negotiations, at least on Defendant's part, likely occurred in New York.  Whether Plaintiff negotiated the York Policies from its headquarters in Pennsylvania, or through Henry E. Wood in New York, however, is unclear based on the undisputed facts of record.  Because no party has firsthand knowledge of where negotiation occurred, and the facts do not clearly support a finding that negotiation took place entirely either in New York or Pennsylvania, or in both states, this factor is neutral.

### c.   Place of Performance

Regarding the third factor, place of performance, "[a]n insurance contract is 'performed' in the state in which insurance premiums are received." *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, Civ. No. 11-cv-247, 2013 WL 5436934, *48 (W.D. Pa. Sept. 27, 2013) (citing *Gould, Inc. v. Cont'l Cas. Co.*, 822 F. Supp. 1172, 1176 (E.D. Pa. 1993)); *Armotek Indus., Inc. v. Emp'rs Ins. of Wausau*, 952 F.2d 756, 761 n.7 (3d Cir. 1991)).  Here, there is no evidence as to where York Corporation paid its insurance premiums or where the premiums were received by Defendant.  Although Defendant had offices in both Pennsylvania and New York, the record does not reflect that either of those offices received the premiums.[6]  While the New York office is listed as the sales office, Defendant was, and is, headquartered in Massachusetts, and the office that negotiated the contract would not necessarily receive premium payments.  Accordingly, the court is unable to determine where Plaintiff performed its contractual obligations.  Without any evidence to suggest otherwise, the court therefore assumes that Defendant ultimately received and processed premiums at its headquarters in Massachusetts.  Therefore, this factor is also neutral.

### d.   Subject Matter Location

---

[6]  The court gives no credence to Defendant's assertion that this factor favors the application of New York law because premiums were received in New York by Plaintiff's broker or advisor, Henry E. Wood, and then forwarded on to Defendant.  First, this averment is not supported by the record because the court has stricken the portions of the McCullough Affidavit which include speculation by Mr. McCullough about facts of which he has no personal knowledge.  Second, even if the court did accept Defendant's averments about receipt of premiums by Henry E. Wood, the fact that a third-party intermediary received the premiums in a certain state and then forwarded them on to an insurer would not constitute receipt by the insurer in the intermediary's state of operation.  Henry E. Wood would have been, if anything, an agent of Plaintiff, not Defendant, so Defendant would not have received the premiums until after they were forwarded on by Henry E. Wood.

"The fourth factor, location of the subject matter of the contract, refers to the location of the insured risk." *Hammersmith*, 480 F.3d at 234 (citing *Manor Care, Inc. v. Cont'l Ins. Co.*, Civ. No. 01-cv-2524, 2003 WL 22436225, *7 (E.D. Pa. Oct. 27, 2003)).  This factor does not favor the application of either New York or Pennsylvania law because the York Policies provided nationwide coverage to Plaintiff, and thus there is no identifiable location for the risk insured by the policies. *Specialty Surfaces*, 609 F.3d at 234.  Therefore, this factor is also neutral.

### e.   Location of the Parties

In determining the location of the parties, the court's focus should be on "the protection of the parties' justified expectations at the time of contracting." *Pacific Emp'rs*, 693 F.3d at 438-39; *see also Gould*, 822 F. Supp. at 1176 (determining choice of law based on domicile and headquarters of the parties "when the parties entered into the contracts . . .").  At the time of contracting, Plaintiff's predecessor entity, York Corporation, was headquartered and domiciled in York, Pennsylvania, and incorporated in Delaware.  Although Plaintiff was incorporated in Delaware, "[a] corporation's principal place of business is a more important contact than its place of incorporation." *Air & Liquid Sys.*, 2013 WL 5436934, at *48 (citing *Specialty Surfaces*, 609 F.3d at 234.).  As for Defendant, it was incorporated and headquartered in Massachusetts, and maintained offices in both Pennsylvania and New York.  Thus, at the time of contracting, Plaintiff maintained its principal place of business in Pennsylvania, Defendant had at least one office in Pennsylvania, neither party maintained its principal place of business in New York, and Plaintiff had no offices in New York.   Therefore, this factor favors the application of Pennsylvania law.

#### f.    Governmental Interests

Having considered the factors listed above, the court must finally determine which state "has the most significant relationship to the insurance contract, and the greatest governmental interest in seeing its laws enforced." *Hammersmith*, 480 F.3d at 235.  In determining which state has the most significant relationship to the underlying contract, the court must consider "the interests and policies that may be validly asserted by each jurisdiction." *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978).  The above factors demonstrate that Pennsylvania has the most significant relationship with the York Policies.  Moreover, the court finds that Pennsylvania's interest in regulating insurance contracts that were contracted for in Pennsylvania and issued to an insured with its headquarters in Pennsylvania is more significant than New York's interest in regulating insurance contracts that were negotiated by an out-of-state insurer from its New York sales office.

Because Pennsylvania has the most significant relationship to the York Policies and the greatest governmental interest in having its laws enforced, the court will apply Pennsylvania law to the remaining issues in the instant case.

### V.         Conclusion

For the foregoing reasons, the court finds that portions of the McCullough Affidavit submitted by Defendant contain inadmissible evidence and the court will therefore grant, in part, Plaintiff's motion to strike.  In response to the parties' cross-motions for summary judgment as to choice of law, the court finds that Pennsylvania has the most significant relationship to the insurance contracts and that

Pennsylvania law will apply to the remainder of the dispute between the parties. Therefore, the court will grant Plaintiff's motion for summary judgment and deny Defendant's cross-motion for summary judgment.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  July 9, 2015.